UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                         :
RICARDO COLLINS,                         :          NO. 3:19 CV 1689(RMS)
       Plaintiff,                        :
                                         :
V.                                       :
                                         :
DR. FIGURA, et al.,                      :
       Defendants.                       :
                                         :          DATE: January 6, 2023
                                         :
------------------------------------------------------ x
```

<u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

Ricardo Collins ("the plaintiff"), who is currently confined at the Corrigan-Radgowski Correctional Center ("Corrigan"), brings this action against Dr. Ilona Figura ("Dr. Figura"), Advanced Practice Registered Nurse Cynthia L'Heureux ("APRN L'Heureux"), and Nursing Supervisor Kara Phillips ("Phillips") (collectively, "the defendants") under 42 U.S.C. § 1983. In the Amended Complaint, the plaintiff alleges a violation of his Eighth Amendment freedom from Cruel and Unusual Punishment based on the defendants' deliberate indifference to his serious medical need concerning care he received while incarcerated. (Doc. No. 32). The plaintiff initially brought additional claims, including a violation of the Equal Protection Clause of the Fourteenth Amendment, but those claims were previously dismissed by the Court (Covello, J.) in its January 3, 2020 and January 4, 2021 initial review orders. (Doc. Nos. 6, 47). The defendants assert the affirmative defense of qualified immunity and move for summary judgment on the plaintiff's Eighth Amendment claim. (Doc. No. 123-1). For the reasons set forth below, the defendants' motion for summary judgment is **GRANTED**.

I.      **FACTUAL BACKGROUND**

The following facts, which are taken from the defendants' Local Rule 56(a)1 Statement of Material Facts (Doc. No. 123-23), the plaintiff's Statement of Material Facts (Doc. No. 143), and the record, are undisputed unless otherwise indicated.

On April 16, 2009, the plaintiff began serving a 71-year prison sentence. (Doc. No. 123-23 at 1). At all times relevant to the claims alleged in the Amended Complaint, the plaintiff was a convicted prisoner in the custody of the Connecticut Department of Correction ("DOC"). (*Id.*).

The plaintiff first injured his knee while playing basketball on October 14, 2017. (Doc. No. 123-23 at 2; Doc. No. 143 at 6). His injury was exacerbated when he "jumped off [a] couch." (*Id.*). The plaintiff was treated at UConn Health in Farmington, Connecticut, for his injury. (*Id.*). Initially, he was given a brace for his knee. (*Id.*).

On March 16, 2016, Drs. Cory Edgar and Katherine Coyner performed surgery on the plaintiff's left knee. (*See* Doc. No. 124). The surgery, which involved reconstruction of the anterior cruciate ligament ("ACL"), took approximately three and a half hours, and was without complications. (*Id.* at 1). The surgeons contemplated that the plaintiff's recovery would be slow and that it could take up to a year for the plaintiff to return to full function. (Doc. No. 124 at 2). He was expected to use a knee or leg brace for at least a year following the surgery. (Doc. No. 124 at 6).

In their post-operative instructions, the surgeons directed the plaintiff to take Lovenox for approximately three days for pain control and swelling. (Doc. No. 124 at 5). The plaintiff was not cleared for weightbearing or terminal extension until the Monday following the surgery, at which point the plaintiff received physical therapy, as well as an ankle foot orthosis ("AFO") brace to facilitate walking for at least three to six months. (Doc. No. 124 at 6). The surgeons recommended

that the plaintiff move his knee during physical therapy to maximize terminal extension. (*Id.*). The plaintiff was scheduled for follow-up and suture removal within one to two weeks following surgery. (*Id.*). *The surgeons' post-operative instructions did not mention the use of an exercise bike, weights, bands, or a pool as part of the plaintiff's recovery plan.*[1]

On March 28, 2018, the plaintiff had a post-operative consultation with a physical therapist at UConn Health. (*See* Doc. No. 30 at 1-3). The physical therapist recommended a Home Exercise Program ("HEP")[2] for the plaintiff involving a battery of exercises three times per day. (*Id.*). *These exercises, which were explained to the plaintiff in writing, did not require the use of an exercise bike, weights, bands, or a pool.*

The plaintiff had a follow-up post-operative visit at UConn Orthopedics on April 6, 2018. (*See* Doc. No. 128 at 1-3). Dr. Daniel O'Brien conducted a physical examination of the plaintiff and provided an assessment and plan for his care. (*Id.*). In a note regarding his examination, Dr. O'Brien indicated that the plaintiff's pain was well controlled; his knee had been weightbearing; he was ambulating with a walker; he was in no acute distress; and he was resting comfortably. (Doc. No. 128 at 1). Dr. O'Brien also noted that the plaintiff had not been wearing his Bledsoe brace[3] as directed, which increased the risk that his ACL reconstruction could fail. (*Id.*). *Dr. O'Brien did not state or opine that the plaintiff should use an exercise bike, weights, bands, or a pool.*

---

[1] The plaintiff maintains that "UCONN Dr. Coyner and Dr. Edgar also prescribed a treatment plan that included[:] exercise bike, weight machines, and treadmill."

[2] HEPs, as utilized by DOC, consisted of exercises that inmates could perform while inside their prison cells. (Doc. No. 123-23 at 5). They often included stretches and strength-building activities that inmates could do on their own as part of a rehabilitative care plan established by a medical provider, physical therapist, or other specialist at UConn Health. (*Id.* at 6).

[3] A Bledsoe brace is worn on the knee for stability and to limit range of motion. It is larger than an adjustable foot drop ("AFO") brace, which covers only the ankle.

On May 17, 2018, Dr. Figura submitted a request to the Utilization Review Committee ("URC")[4] for the plaintiff to receive a physical therapy consultation. (Doc. No. 123-23 at 10). On May 23, 2018, the URC denied the request and recommended that the plaintiff continue the HEP that had been recommended by a physical therapist at UConn Health during the plaintiff's March 2018 consultation. (*See* Doc. No. 135). *The URC did not mention the use of an exercise bike, weights, bands, or a pool.*

On July 13, 2018, the plaintiff had a follow-up orthopedic examination at UConn Health. (Doc. No. 143 at 6, 12-15).

On September 12, 2018, the plaintiff had a post-operative physical therapy consultation at UConn Health. (*See* Doc. No. 130 at 8-10). The physical therapist recommended a HEP involving various exercises five to seven times per week. (*Id.*). The HEP was intended to be reevaluated after four weeks. (*Id.*). *The HEP that the physical therapist recommended did not involve the use of an exercise bike, weights, bands, or a pool.*

On October 22, 2018, the plaintiff had another post-operative physical therapy consultation at UConn Health. (*See* Doc. No. 130 at 11-13). The physical therapist again recommended a HEP involving daily exercises that would be reassessed after four weeks. (*Id.*). *The HEP did not involve the use of an exercise bike, weights, bands, or a pool.*

On December 4, 2018, the plaintiff had another post-operative physical therapy consultation at UConn Health.[5] (*See* Doc. No. 130 at 14-15). *The physical therapist again recommended a HEP that did not involve the use of an exercise bike, weights, bands, or a pool.*

---

[4] The URC is a panel of doctors and other medical providers responsible for authorizing specialized medical care (*i.e.*, surgical care, physical therapy, outpatient specialty care) for DOC inmates.

[5] The plaintiff's post-operative physical therapy consultation on December 4, 2018, occurred after both Dr. Figura and APRN L'Heureux had left their employment with DOC. (Doc. No. 123-23 at 14). Dr. Figura left the DOC on July 13, 2018, and APRN L'Heureux left in early November 2018. (*Id.*).

Although the physical therapist referenced a "stationary bike" in consultation notes, neither the recommendation on the consultation form nor the handwritten document detailing the recommended HEP exercises indicated that it was medically necessary for the plaintiff to use an exercise or stationary bike; rather, the form specified only that the plaintiff "may benefit from stationary bike at facility." (Doc. No. 130 at 14).

## II.  PROCEDURAL HISTORY

On October 28, 2019, the plaintiff filed suit against Dr. Figura, APRN L'Heureux, Phillips, and Deputy Warden Cotta in their individual capacities, alleging constitutional violations under 42 U.S.C. § 1983 and seeking monetary damages. (Doc. No. 1). In an Initial Review Order dated January 3, 2020, the Court (Covello, J.) dismissed all the plaintiff's claims against Phillips and Deputy Warden Cotta, dismissed the plaintiff's Equal Protection Clause claim against Dr. Figura, and permitted the sole remaining Eighth Amendment claim against Dr. Figura to go forward. (Doc. No. 6).

On November 6, 2020, the plaintiff filed an Amended Complaint against Dr. Figura, APRN L'Heureux, and Phillips, alleging violations of his rights under the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment. (Doc. No. 32). In his Amended Complaint, the plaintiff alleges that he sustained injury to his knee and foot in October 2017. (Doc. No. 32 at 4). On March 16, 2018, the plaintiff had surgery on his knee, and on July 13, 2018, he had surgery to repair muscles in his leg.[6] (Id.). After his surgeries, the plaintiff received physical therapy from Kimberly Preloski ("Preloski") at UConn Health.[7] (Id.). The plaintiff alleges that Preloski told him he needed to use an exercise bike and weight machines as part of his rehabilitation. (Doc. No. 32

---

[6] There is no other evidence in the record that the plaintiff underwent a second surgery on July 13, 2018, or on any other date.

[7] There is no other evidence in the record that the plaintiff was treated by a physical therapist named Kimberly Preloski.

at 5). Since the plaintiff did not have access to this equipment at Corrigan, he informed the defendants that he needed a transfer to MacDougall-Walker ("MacDougall"). (*Id.*). The plaintiff alleges that, by remaining at Corrigan, he was forced to use a wheelchair, and to experience pain and instability in his knee. (Doc. No. 32 at 5-6). Moreover, the plaintiff asserts that the defendants' "failure to follow the treatment plan cause[d] the plaintiff's knee to deteriorate and los[e] strength, . . . [and] to gain 60 pounds putting him at risk for Covid 19 because of the plaintiff's high blood pressure." (Doc. No. 32 at 6). The plaintiff maintains that "he has not be[en] able to exercise or consistently move without pain and the risk of more injury," and that "[b]y not allowing plaintiff to go to [MacDougall], the defendant[s] intended to injur[e] plaintiff knowingly or unknowingly." (*Id.*). Finally, the plaintiff asserts that "[t]he defendant[s] did not inquire [about] the equipment or rehabilitation program [at MacDougall], nor did they care to, which is malicious and show[s] bad faith intent to injur[e] plaintiff." (*Id.*).

In an Initial Review Order of the Amended Complaint dated January 4, 2021, the Court (Covello, J.) dismissed the plaintiff's Equal Protection Clause claims and permitted the Eighth Amendment claims to move forward as to all three defendants. (Doc. No. 47).

On December 6, 2021, the defendants filed an answer in which they alleged the following affirmative defenses: 1) qualified immunity; 2) failure to exhaust administrative remedies; and 3) failure to mitigate damages. (Doc. No. 64). The defendants now move for summary judgment on the plaintiff's remaining Eighth Amendment claims against all three defendants. (Doc. No. 123-1).

## III.    LEGAL STANDARD

The principles governing this Court's review of a motion for summary judgment are well established. "Summary judgment is appropriate only if the movant shows that there is no genuine

issue as to any material[8] fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted); *see* Fed. R. Civ. P. 56(a). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Because the plaintiff is a *pro se* party, his pleadings and submissions must be afforded liberal construction. *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (*per curiam*). The Court's Local Rules ensure that a self-represented party is thoroughly advised of the procedural requirements for opposing a summary judgment motion. *See* D. Conn. L. Civ. R. 56(b). Moreover, the defendants have complied with the requirement that they serve on the plaintiff a notice detailing the rules that govern a motion for summary judgment. (Doc. No. 139).[9]

---

[8] A fact is "material" if it might affect the outcome of suit under the substantive law applicable to the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9] The defendants argue in their reply that the plaintiff has failed to satisfy the procedural requirements set forth in Local Rule 56(a)(2). (*See* Doc. No. 144 at 1-4). The Court agrees that the numbered paragraphs in the plaintiff's Rule 56(a)(2) Statement do not correspond to the paragraphs contained in the defendants Rule 56(a)(1) Statement. (*Compare* Doc. Nos. 123-23, 143). Nevertheless, because the plaintiff is self-represented, the Court will construe his response liberally and will consider the merits of his opposition to the motion for summary judgment despite its procedural deficiencies.

## IV.    DISCUSSION

In their motion for summary judgment, the defendants argue that there is no genuine dispute of material fact and that: (1) they did not violate the plaintiff's Eighth Amendment rights; and (2) they were not deliberately indifferent to the plaintiff's serious medical needs.[10] (Doc. No. 123-1 at 1). The defendants also assert that they are protected from liability under the qualified immunity doctrine. (*Id.*). The plaintiff counters that the defendants failed to follow the treatment plan prescribed by the physicians at UConn Medical despite knowing that this would negatively impact his recovery, and that the defendants are not entitled to qualified immunity because their conduct was deliberately indifferent to his serious medical need.[11] (Doc. No. 143 at 2).

Viewing the evidence in the light most favorable to the plaintiff, the Court finds that there are no genuine disputes of material fact regarding the remaining constitutional claim; the defendants did not violate the plaintiff's Eighth Amendment rights; and their conduct was not deliberately indifferent to the plaintiff's serious medical need. Accordingly, the Court grants summary judgment as to the plaintiff's Section 1983 claim against all defendants. Although the Court need not address the defendants' affirmative defense of qualified immunity, if it were to reach that issue, it would find that the defendants are entitled to qualified immunity because their conduct was objectively reasonable and did not violate a clearly established right. Finally, to the extent the plaintiff intends to assert claims against the defendants regarding medical care he

---

[10] The defendants argue in their motion for summary judgment that there is no genuine dispute of material fact that the Eighth Amendment does not apply since their alleged conduct does not amount to "punishment." (Doc. No. 123-1 at 70-78). The defendants subsequently withdrew this argument, however, so the Court does not address it. (Doc. No. 145).

[11] In the "Plaintiff Statement of Disputed Factual Issues," the plaintiff asserts that the defendants are not entitled to qualified immunity "when sued in both capacities." (Doc. No. 143 at 3). The Court does not reach this issue because the plaintiff brought claims against the defendants in their individual capacities only. In any event, the plaintiff seeks money damages, and the Eleventh Amended precludes claims for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Insofar as the defendants are state actors, they are only liable for damages for actions taken in their individual capacities.

received before his surgery on March 18, 2018, such claims are not properly before this Court and may not serve as a basis upon which to overcome summary judgment.[12]

## A.     Deliberate Indifference to Medical Needs

The plaintiff alleges that the defendants were deliberately indifferent to his post-operative treatment needs in that they did not adhere to the treatment plan prescribed by doctors at UConn Health. (Doc. No. 143 at 1).

In the post-conviction context, the Eighth Amendment applies to a claim of deliberate indifference to a serious medical need. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (holding that the Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners") (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989)).

A prison official's deliberate indifference to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle*, 429 U.S. at 104. To prevail on such a claim, a plaintiff must offer evidence of sufficiently harmful acts or omissions by a prison official. *See id.* at 104-06. Furthermore, the prison official must have intended either to either deny or unreasonably delay access to necessary medical care, or to wantonly inflict

---

[12] In his opposition papers, the plaintiff argues that he "sustain[ed] his injury on October 14, 2017 and was not treated with surgery to repair his knee until March 16, 2018, five months later. The denial of medical care when a severe injury occur[s] with c[h]ronic pain violates the plaintiff['s] 8 Amendment right. The defendants were aware of the plaintiff[']s pain and suffering and his serious medical need, and did not provide Due Care by sending him to the hospital. Such actions are deliberate indifference." The plaintiff did not raise this allegation in the Complaint or the Amended Complaint, and "an opposition brief is not the place to raise new allegations." *Terbush v. Mitchell*, No. 3:15 CV 1339(SALM), 2017 WL 663198, at *18-19 (D. Conn. Feb. 17, 2017) (internal quotation marks omitted); *see Lyman v. CSX Transp., Inc.*, 364 Fed. App'x 699, 701 (2d Cir. 2010) (affirming district court's refusal to consider claims raised for the first time in opposition to a summary judgment motion). Indeed, permitting the plaintiff to assert claims regarding the constitutionality of his pre-operative care would unduly prejudice the defendants, particularly where, as here, the plaintiff is raising them for the first time in his response to the defendants' second motion for summary judgment. *See Terbush*, 2017 WL 663198, at *7 ("This is now the second motion for summary judgment filed by defendant, and if the Court were to consider this new theory of deliberate indifference, then presumably, defendant would seek to file a third motion for summary judgment and/or a motion for leave to conduct further discovery on this issue. This simply is not a reasonable demand for the plaintiff, or the Court, to make of defendant at this juncture in the case.").

unnecessary pain. *See id.* "[N]ot every lapse in prison medical care will rise to the level of a constitutional violation; rather, the conduct complained of must shock the conscience or constitute a barbarous act." *Daniels v. Murphy*, 3:11 CV 286(SRU), 2014 WL 3547235, at *8 (D. Conn. Jul. 17, 2014) (internal quotation marks omitted).

To state a claim for deliberate indifference to a serious medical need, a plaintiff must satisfy both the subjective and objective components. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995). Under the subjective prong, a prison official must have been actually aware that his or her actions or inactions would cause a substantial risk of harm to the inmate. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994)). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Id.* at 380. Recklessness requires more than mere negligent conduct. *See id.* "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim," and that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Thus, mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019).

To establish the objective element for a claim of deliberate indifference to medical needs, a plaintiff "must show that he actually did not receive adequate care and that the inadequacy in medical care was sufficiently serious." *Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) (summary order). Factors to be considered when determining the seriousness of a medical need

include: (1) whether "a reasonable doctor or patient would find [it] important and worthy of comment"; (2) whether it "significantly affects an individual's daily activities,"; and (3) whether it causes "chronic and substantial pain." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). If a court determines that a plaintiff was deprived of medical care, it must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280 (citation omitted). Where a prisoner was completely deprived of any medical care, courts "examine whether [his or her] medical condition is sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178 (2d Cir. 2003)). Where, as here, however, the prisoner received medical treatment but complains that it was somehow inadequate, "the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. The Court must determine "whether the inadequacy in the medical care is sufficiently serious." *Thompson v. Recette*, 519 F. App'x 32, 34 (2d Cir. 2013) (summary order).

### 1.    Subjective Prong

The defendants argue that there is no genuine dispute that they were not actually aware that their conduct would cause a substantial risk of harm to the plaintiff. (*See* Doc. No. 123-1 at 28). Rather, the defendants assert that they provided the plaintiff with access to multiple medical treatment providers, each with his or her own treatment recommendations, as well as the ability to schedule follow-up appointments and physical examinations with them. (*Id.*). Moreover, the defendants state that they explored the possibility of transferring the plaintiff to two other facilities and assisted him in obtaining specialty care beyond what could be provided at Corrigan. (*Id.*). For the reasons set forth below, the Court finds that the defendants have satisfied their burden on summary judgment by identifying an absence of evidence in the record that would support the subjective prong of this Circuit's deliberate indifference analysis. *See Garden Catering-Hamilton*

*Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 127 (D. Conn. Feb. 28, 2014) ("Where, as here, a defendant seeks to show that a plaintiff cannot sustain its burden at trial, the defendant's burden on summary judgment 'will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'" (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).

The extent of each defendant's involvement in the plaintiff's care varies; therefore, the Court will address each defendant separately.

### a.    Dr. Figura

Dr. Figura has been a medical doctor and board-certified internist since 1987. (Doc. No. 123-23 at 14). From approximately March 2015 until July 13, 2018, Dr. Figura worked as a principal physician at Corrigan. (*Id.*).

Since Dr. Figura left Corrigan for private practice, she has not been involved in providing medical care to any DOC inmates, including the plaintiff. (Doc. No. 123-23 at 15). Although Dr. Figura provided medical care to the plaintiff and other inmates prior to leaving the DOC, she was neither present for, nor involved in, the plaintiff's surgery at UConn Medical on March 16, 2018, or the plaintiff's post-operative care at UConn Health between March 16, 2018, and March 19, 2018. (*Id.*).

On March 21, 2018, Dr. Figura issued a telephone order for daily dressing changes to the plaintiff's left knee until healed. (*Id.*). The following day, Dr. Figura ordered that the plaintiff receive Tylenol 3[13] upon learning that the plaintiff had not received any. (Doc. No. 123-23 at 16).

---

[13] Tylenol 3 is a Schedule III narcotic pain medication consisting of acetaminophen and codeine. (Doc. No. 123-23 at 16).

Dr. Figura reviewed, signed, and stamped the summary and recommendations from the plaintiff's March 28, 2018 physical therapy consultation at UConn Health, which recommended a HEP involving a battery of exercises three times per day. (Doc. No. 123-23 at 16-17).

On April 4, 2018, while the plaintiff was in the inpatient unit ("IPU") at Corrigan, he met with Dr. Figura for a clinical visit. (Doc. No. 123-23 at 17). During that visit, Dr. Figura conducted a physical examination of the plaintiff's left leg, including his knee and foot, and assessed the range of motion in his knee and ankle. (*Id.*). Based on her assessment, Dr. Figura concluded that the plaintiff was ready for discharge from the IPU into the prison's general population, provided that he wore a brace and used a walker. (*Id.*). She issued an order for daily dressing changes to the plaintiff's left leg for one week. (*Id.*). She reviewed, signed, and stamped the plaintiff's orthotics consultation form, summary, and recommendations. (Doc. No. 123-23 at 17-18). Between April 6, 2018, and April 10, 2018, Dr. Figura also reviewed, signed, and stamped the April 6, 2018 report from the plaintiff's nerve conduction test at UConn Health. (Doc. No. 123-23 at 18).

On April 12, 2018, Dr. Figura met with the plaintiff for a follow-up clinical visit in the IPU during which she conducted a physical examination of the plaintiff's left leg, including his knee and ankle. (*Id.*). She observed that the plaintiff's condition was progressing well and made a note to explore the possibility of transferring the plaintiff to Cheshire Correctional Institution ("Cheshire"), where he would be able to ambulate more and use an exercise bike and weights, neither of which was available at Corrigan. (Doc. No. 123-23 at 18-19).

The following day, Dr. Figura issued a telephone order for an ice bag to be provided to the plaintiff twice a day for comfort as needed for seven days following completion of his HEP exercises. (Doc. No. 123-23 at 19).

On April 20, 2018, Dr. Figura met with the plaintiff for another follow-up clinical visit in the IPU. (*Id.*). Dr. Figura conducted a physical examination of the plaintiff's left leg, including his knee and ankle. (*Id.*). The plaintiff was able to fully extend his left lower extremity and could flex to 100 degrees, which Dr. Figura considered to be good progress. (Doc. No. 123-23 at 20). The plaintiff informed Dr. Figura that he felt great and that he could walk while wearing an AFO brace; he signed a document refusing a Bledsoe brace. (Doc. No. 123-23 at 19-20). Dr. Figura ordered the plaintiff's release into the general population with a walker and a walker pass, an AFO brace and an AFO brace pass, a bottom bunk pass, and a bottom tier pass for six months. (Doc. No. 123-23 at 20). Dr. Figura also ordered that the plaintiff receive Tylenol (650 milligrams) once daily for knee pain for three weeks, at which point the plaintiff could obtain additional pain medication from the commissary as needed. (Doc. No. 123-23 at 21).

On May 17, 2018, Dr. Figura submitted a request to the URC for a physical therapy consultation, which the URC denied on May 23, 2018. (*Id.*). Instead, the URC panel recommended that the plaintiff continue the HEP that a physical therapist at UConn Health had already created for him. (*Id.*). Neither Dr. Figura, APRN L'Heureux, nor Phillips had the authority to overrule a URC decision. (Doc. No. 123-23 at 22).

On June 13, 2018, the plaintiff refused to see Dr. Figura in the IPU. (*Id.*). Dr. Figura told DOC staff that she wanted to see the plaintiff that day so she could assess why he had stopped using the walker she had ordered. An emergency had arisen by the time the plaintiff decided to see Dr. Figura in the IPU, so the plaintiff's visit was rescheduled for the following day. (*Id.*).

In addition to Dr. Figura, APRN L'Heureux or another member of the nursing staff was always available to provide care to the plaintiff. (Doc. No. 123-23 at 23). Indeed, providers other than the defendants routinely provided post-operative care to the plaintiff. (*Id.*).

14

b.    **APRN L'Heureux**

APRN L'Heureux has been a registered nurse since 1987. (Doc. No. 123-23 at 24). While APRN L'Heureux was employed by the State of Connecticut between May 17, 2013, and early November 2018[14], she provided medical care to inmates at the UConn Health Correctional Managed Health Care ("CMHC") unit and in DOC facilities. (*Id.*). APRN L'Heureux was assigned to the CMHC unit until April 2018, when inmate medical care was moved to Corrigan and the other DOC prison facilities. (Doc. No. 123-23 at 25).

While APRN L'Heureux was employed at DOC, she provided medical care to the plaintiff and other inmates. Since APRN L'Heureux stopped working for DOC in early November 2018, however, she has not had contact with, or provided care to, any inmates, including the plaintiff. (Doc. No. 123-23 at 26). APRN L'Heureux was not present for, or involved in, the plaintiff's surgery at UConn Health on March 16, 2018, or his post-operative care between March 16, 2018, and March 19, 2018. (Doc. No. 123-23 at 26-27).

On March 19, 2018, APRN L'Heureux reviewed and signed the plaintiff's discharge paperwork from UConn Health. (Doc. No. 123-23 at 27). The following day, APRN L'Heureux met with the plaintiff for a clinical visit while he was in the IPU. (*Id.*). During that visit, the plaintiff reported that he could not and would not get out of bed without a wheelchair, that he did not need more stool softeners, and that he was icing his left knee while it was in an immobilizer. (*Id.*). APRN L'Heureux conducted a physical examination and determined that the plaintiff had good circulation, color, movement, sensation, and temperature in his left lower leg. (Doc. No. 123-23 at 27-28). APRN L'Heureux opined that the plaintiff should continue to ice, take aspirin and Tylenol 3, and engage in weightbearing activities. (Doc. No. 123-23 at 28). APRN L'Heureux issued an

---

[14] APRN L'Heureux recalls that her employment at DOC ended sometime between November 5, 2018, and November 9, 2018. (Doc. No. 123-23 at 25-26).

order authorizing the plaintiff to use a wheelchair for seven days, as well as an order discontinuing a prior Tylenol 3 order and another directing that the plaintiff receive two Tylenol tablets by mouth three times per day for up to six days. (*Id.*). That same day, APRN L'Heureux observed the plaintiff get out of bed during recreation period. (*Id.*).

On March 26, 2018, APRN L'Heureux issued an order directing that the plaintiff receive one tablet of Tylenol 3 by mouth every eight hours for seven days. (Doc. No. 123-23 at 29).

On April 9, 2018, APRN L'Heureux met with the plaintiff for a clinical visit while he was in the IPU. (*Id.*). Although the plaintiff was not wearing a Bledsoe brace at the time, he told APRN L'Heureux that he was willing to wear one and that he wanted to transfer from the Corrigan facility to either the MacDougall or the Cheshire facility. (Doc. No. 123-23 at 29-30). The plaintiff also stated that he wanted to leave the IPU and that he did not need Elavil.[15] (Doc. No. 123-23 at 30). APRN L'Heureux encouraged the plaintiff to wear a Bledsoe brace for optimal healing and to promote functionality and mobility. (*Id.*). APRN L'Heureux reviewed and signed the consultation forms, summaries, and recommendations from the plaintiff's visit to UConn Orthopedics and his nerve conduction study. (*Id.*). At the plaintiff's request, APRN L'Heureux issued an order discontinuing Elavil, aspirin, and Senna. (Doc. No. 123-23 at 31). In that order, APRN L'Heureux also renewed the plaintiff's blood pressure medication and calcium with vitamin D supplement. (*Id.*).

The following day, APRN L'Heureux met with the plaintiff in the IPU for a clinical visit. (*Id.*). The plaintiff stated that he no longer wished to take calcium but would not sign a refusal form. (Doc. No. 123-23 at 32). APRN L'Heureux met with the plaintiff later the same day to discuss the plaintiff's blood pressure medication. (*Id.*). APRN L'Heureux issued one order

---

[15] Elavil is an antidepressant that is prescribed as a sleep aid and pain reliever. (Doc. No. 123-23 at 30).

discontinuing calcium at the plaintiff's request and another order continuing the plaintiff's blood pressure monitoring. (*Id.*).

On July 24, 2018, APRN L'Heureux met with the plaintiff for a clinical visit after he came to the medical unit in a wheelchair. (Doc. No. 123-23 at 33). During this visit, the plaintiff stated that he could ambulate with the assistance of a walker. (*Id.*). APRN L'Heureux observed the plaintiff stand and slowly walk three feet. (*Id.*). The plaintiff told APRN L'Heureux that he wanted to transfer to MacDougall for physical therapy and to use a "bike." (*Id.*). APRN L'Heureux requested a physical therapy consultation at UConn Health to evaluate the plaintiff's knees and to address his post-surgical care concerns. (Doc. No. 123-23 at 33-34). APRN L'Heureux also requested a consultation with Hangar Orthotics/Prosthetics regarding the plaintiff's AFO brace concerns. (Doc. No. 123-23 at 34).

On August 20, 2018, APRN L'Heureux signed off as the attending provider following the plaintiff's consultation regarding his AFO brace concerns during which the plaintiff was measured for extra-depth shoes. (*Id.*). On September 12, 2018, APRN L'Heureux signed off as the attending provider following the plaintiff's physical therapy consultation at UConn Health, which included a recommendation for a HEP five to seven times per week. (Doc. No. 123-23 at 34-35).

On October 15 or 16, 2018, APRN L'Heureux signed off on the plaintiff's chart maintenance, which included adding and renewing his blood pressure medications. (Doc. No. 123-23 at 36). On October 22, 2018, APRN L'Heureux signed off as the attending provider following the plaintiff's physical therapy consultation at UConn Health during which another HEP was recommended. (*Id.*).

### c.    Nursing Supervisor Phillips

Phillips began her employment with the State of Connecticut on July 26, 2013, as a registered nurse at UConn Health. (Doc. No. 123-23 at 38). In October 2014, she began working in DOC facilities as both a registered nurse and nursing supervisor. (*Id.*). Phillips is currently employed by the DOC. (Doc. No. 123-23 at 38-39).

In 2017, Phillips began overseeing the nurses at Corrigan. (Doc. No. 123-23 at 39). In this administrative role, she did not provide direct patient care. (*Id.*). Instead, her job functions consisted of payroll, scheduling, procurement, auditing, organizing facility tours, and supervising the nursing staff. (*Id.*). Phillips occasionally took overtime shifts during which she worked as a registered nurse providing direct patient care. (Doc. No. 123-23 at 40).

Phillips did not have the authority in any of her roles to overrule medical decisions, orders, and determinations of doctors, APRNs, or medical administrators. (*Id.*). Although she did not have the authority as a nursing supervisor to dictate doctors' medical care decisions or DOC administrators' decisions regarding inmate housing and transfers, she could make initial inquires to higher-ranking DOC administrators for inmate transfers to other DOC facilities. (Doc. No. 123-23 at 41-42).

Phillips's interaction with the plaintiff was limited to making initial inquiries of administrators at Cheshire and MacDougall to see if they could accommodate the plaintiff's transfer from Corrigan. (Doc. No. 123-23 at 42). After the plaintiff expressed a desire to transfer to MacDougall so that he could participate in its Wellness Program and utilize its exercise equipment, Phillips inquired about a transfer to Cheshire on May 21, 2018, and to MacDougall initially on August 1, 2018, and again on December 3, 2018. (Doc. No. 123-23 at 42-43). Despite

her efforts, Phillips was unable to secure a transfer for the plaintiff since she did not have the unilateral authority to authorize it. (Doc. No. 123-23 at 43).

Phillips distributed medications to inmates only during the shifts she covered for nursing staff on December 7, 2019, December 13, 2019, January 9, 2020, January 16, 2020, and February 2, 2020. (*Id.*). On each of these dates, the plaintiff refused his medications. (*Id.*).

Phillips was involved in the plaintiff's sick call request for a new mattress on February 8, 2020. (Doc. No. 123-23 at 43-44). Following that call, she requested that a nurse schedule a follow-up visit for the plaintiff with a physical therapist at UConn Health. (Doc. No. 123-23 at 44).

The undisputed material facts in the record do not demonstrate that any of the defendants acted in a manner "that evinces a conscious disregard of a substantial risk of serious harm." *Charles*, 925 F.3d at 87. To be sure, "[i]n cases where an inmate was instructed on exercises to do on his own, courts have dismissed claims for deliberate indifference to a serious medical need to receive physical therapy." *Wortham v. Plourde*, No. 3:12 CV 1515(DJS), 2014 WL 4388560, *4 (D. Conn. Sept. 5, 2014) (citing *Villareal v. Walker*, No. 06 CV 3266(HAB), 2009 WL 801637, at *7 (C.D. Ill. Mar. 24, 2009) (granting summary judgment on claim that doctor was deliberately indifferent to plaintiff's serious medical need for physical therapy where doctor showed plaintiff exercises to do on his own rather than send him to a physical therapist)). In *Wortham*, the Court concluded "that a reasonable official in [the defendant's] position would not understand that encouraging an inmate to perform exercises he was taught by a doctor, rather than sending him to physical therapy, violated the inmate's constitutional rights." 2009 WL 801637, at *5. Likewise, here, a reasonable official in any of the defendants' shoes would not have understood that she was violating the plaintiff's constitutional rights by ensuring that he receive physical therapy consultations and deferring to a physical therapist's recommendation that the plaintiff adhere to an

HEP. The plaintiff does not point to any evidence to support a finding that the defendants acted recklessly. To the contrary, the record demonstrates that the defendants' treatment of the plaintiff was thorough and medically appropriate under the circumstances. The plaintiff has not identified any medical evidence to suggest that the defendants' care of the plaintiff was improper or that it amounted to malpractice, let alone that it reflected deliberate indifference rising to the level of an Eighth Amendment violation.

## 2.    Objective Prong

The defendants assert that there is no genuine dispute that the plaintiff has failed to demonstrate a sufficiently serious inadequacy in the treatment he received. (*See* Doc. No. 123-1 at 60). The defendants argue that, although the plaintiff wanted access to a stationary bike, weights, bands, and a swimming pool, as well as a transfer from Corrigan to another prison facility, there is no constitutional requirement that he be provided care beyond that which is medically necessary under the circumstances. (*Id.*). For the reasons set forth below, the Court finds that the defendants have satisfied their burden on summary judgment by demonstrating that the plaintiff has failed to present evidence that he had a serious medical need for the post-operative treatment he desired.

Here, the plaintiff received post-operative care, including rehabilitative care, following his surgery on March 16, 2018. Accordingly, in his Amended Complaint, the plaintiff does not claim outright denial of medical care; instead, the plaintiff claims that the care he received was inadequate. (Doc. No. 32 at 4-6). Therefore, this Court's analysis, which focuses on the nature of the care provided rather than the plaintiff's underlying condition alone, is narrower than it would be if the plaintiff had not received any treatment at all. *See Salahuddin*, 467 F.3d at 280.

The plaintiff claims that his treating physicians at UConn Medical prescribed "a treatment plan that included: exercise bike, weight machines, and treadmill." (Doc. No. 143 at 1; *see also*

Doc. No. 32 at 5). The documents that the plaintiff offers in support of this assertion demonstrate otherwise, however. Although the clinical notes from the plaintiff's July 13, 2018 visit to UConn Health indicate that "*[i]t would be helpful* for patient to be able to use exercise bike," they also state that the plaintiff was informed of "the exercises that he may do or substitute for those listed on the protocol which are no[t] possible at facility." (Doc. No. 143 at 12-13) (emphasis added). Indeed, the notes contain a list of suggested exercises for the plaintiff to do as part of a HEP, none of which require the use of equipment. (*See* Doc. No. 143 at 14).

The fact that the plaintiff does not agree with his healthcare providers regarding the adequacy of the HEP he was prescribed does not amount to a claim of deliberate indifference on the part of the defendants. It is well-established that an inmate does not have a right to the medical treatment of his choice. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment") (citation omitted); *Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation"). Moreover, a difference of opinion between an inmate and a medical professional does not constitute evidence of deliberate indifference. *See Bolden v. Cty. of Sullivan*, 523 F. App'x 832, 833 (2d Cir. 2013) ("Indeed, we have held that a disagreement with the type of medical care provided is insufficient to state a constitutional claim; 'the essential test is one of medical necessity and not one simply of desirability'") (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. May 21, 2001) ("disagreements over medications, diagnostic techniques[,] . . . forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim").

The plaintiff has failed to offer evidence to suggest that there was no medical basis for the post-operative treatment plan he was prescribed; the evidence he presents on this point consists largely of his own statements in his declaration disagreeing with the treatment plan administered by the defendants. (*See* Doc. No. 143). The plaintiff's own opinions regarding proper treatment are not admissible evidence and do not create a genuine dispute of fact. *Fuller v. Lantz*, 549 Fed. App'x 18, 20 (2d Cir. 2013) (unpublished) (affidavits of inmate and her acquaintances, none of whom were medical professionals, were "insufficient to create a genuine dispute of fact as to the propriety of a medical diagnosis").

As described in detail above, the defendants offered the plaintiff extensive post-operative care that included: narcotic and non-narcotic pain medication; two different types of braces for the plaintiff's knee; numerous consultations with physical therapists at UConn Health; a specialty consultation with UConn Orthopedics, which included a nerve conduction study; a specialty consultation for orthotics; a HEP involving specific exercises recommended by physical therapists and upheld by the URC; orders for ice; passes for knee braces, a walker, and a wheelchair, as well as for the bottom bunk and tier; and multiple efforts to transfer the plaintiff to two different prison facilities. (Doc. No. 123-23 at 14-44).

The plaintiff suggests that the treatment he received from the defendants was inadequate because it was inconsistent with the recommendations of his physicians at UConn Health, but the record does not support this claim. (*See* Doc. No. 143 at 1). Although the plaintiff contends that "UCONN Dr. Coyner and Dr. Edgar also prescribed a treatment plan that included[] exercise bike, weight machines, and treadmill," the medical records attached as exhibits to his opposition papers reflect otherwise. (*Id.*). Indeed, the treatment notes from the plaintiff's visit to UConn Health on July 13, 2018 specifically contemplated that some rehabilitative care options may not be available

to the plaintiff at the prison facility and recommended alternatives. (*See* Doc. No. 143 at 13 ("The protocol is listed below and we explained to patient the exercises that he may do or substitute for those listed on the protocol which are no[t] possible at facility")).

The UConn Health medical records demonstrate that the plaintiff's treating physicians did not prescribe a rehabilitation regimen that required an exercise bike, bands, weights, a treadmill, or a pool. The plaintiff does not dispute that "UCONN Dr. Coyner and Dr. Edgar prescribed a 'home exercise program' as part of plaintiff['s] treatment plan." (Doc. No. 143 at 1). There is nothing in the record to suggest that any of the plaintiff's treatment providers ever disagreed about the medical sufficiency of the HEP the plaintiff was prescribed. Even if there had been actual disagreement among the plaintiff's medical treatment providers, however, it would not rise to the level of an Eighth Amendment violation. *See, e.g.*, *Ravenell v. Van der Steeg*, No. 05 CV 4042(WHP), 2007 WL 765716, at *6 (S.D.N.Y. Mar. 14, 2007) ("While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, no claim is stated when a doctor disagrees with the professional judgment of another doctor" (internal quotation omitted) (collecting cases)).

Although the plaintiff claims that he should have had access to a bike, weights, bands, a swimming pool, and/or a transfer to MacDougall or Cheshire, there is no constitutional requirement that he be provided the treatment of his choice instead of the treatment he received. Moreover, there is no medical necessity for the plaintiff's desired treatment either. The plaintiff does not offer any competent medical evidence demonstrating otherwise. The plaintiff's disagreement with the recommendations of his medical providers is insufficient to support his Eighth Amendment claim. Insofar as no reasonable jury could determine that the plaintiff received inadequate medical care, there is no disputed material fact as to whether the defendants were

indifferent to the plaintiff's medical needs since they did not disregard the recommendations or prescriptions of the plaintiff's treating physicians.

### B.    Qualified Immunity

The defendants argue as an affirmative defense that they are entitled to qualified immunity even if their actions were unconstitutional because they acted reasonably in response to the plaintiff's needs. (*See* Doc. No. 123-1 at 64-69). The defendants have the burden of proving the affirmative defense of qualified immunity in a motion for summary judgment or at trial. *See Vincent v. Yellich*, 718 F.3d 157, 166 (2d Cir. 2013). To overcome the defendants' affirmative defense of qualified immunity, the plaintiff asserts that "[the d]efendants lo[se] qualified immunity when there's a deliberate indifference to a serious medical need." (Doc. No. 143 at 7). The plaintiff's argument is without merit; however, even if the plaintiff were to demonstrate that the defendants' conduct constituted deliberate indifference, the defendants could still be shielded from suit under the doctrine of qualified immunity. For the reasons set forth below, the Court finds that the defendants are entitled to qualified immunity.

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)). Stated differently, "[i]f an official's conduct did not violate a clearly established constitutional right, or if the official reasonably believed that his conduct did not violate such a right, then he is protected by qualified immunity." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013). When considering a claim of qualified immunity, the court need not consider these questions in any particular order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

24

A right is clearly established if, "at the time of the challenged conduct, . . . every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "A broad general proposition" does not constitute a clearly established right. *See Reichle v. Howards*, 566 U.S. 658, 665 (2012). Rather, the constitutional right alleged to have been violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640). "[R]ights are only clearly established if a court can 'identify a case where an officer acting under similar circumstances' was held to have acted unconstitutionally." *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

There is no case that establishes "beyond debate" that the defendants' conduct constituted deliberate indifference under the Eighth Amendment. Though inmates are clearly entitled to medical care, and the deliberate indifference to their medical needs could constitute a constitutional violation, no court has held that a prisoner has a right to specific exercise equipment, a transfer to a prison facility of his choice for the purpose of gaining access to particular exercise equipment, or a particular physical therapy protocol. In fact, this Court (Squatrito, J.) held that qualified immunity protected a doctor who encouraged an inmate to perform exercises he was taught by another doctor rather than send him to physical therapy. *Wortham*, 2014 WL 4388560, at *5.

Even if the defendants had violated a clearly established right, however, it was objectively reasonable for the defendants to believe that their conduct did not violate such right. "Qualified

immunity does not require application of a single 'reasonable person' standard." *Doe v. Whelan*, 732 F.3d 151, 155 (2d Cir. 2013). "In the context of qualified immunity, a test permitting of a single, objectively-reasonable standard of conduct is irreconcilable with the Supreme Court's recognition that [a public official] may be shielded from liability even if his actions involve errors in judgment." *Id.* "The objective reasonableness test is met—and the defendant is entitled to immunity—if '[public officials] of reasonable competence could disagree' on the legality of the defendant's actions." *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)). A public official's actions are objectively unreasonable for qualified immunity purposes only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon*, 66 F.3d at 420-21.

Here, there is no genuine dispute that a doctor, APRN, or nursing supervisor of reasonable competence could disagree on the legality of the actions taken by Dr. Figura, APRN L'Heureux, and Nursing Supervisor Phillips, respectively. Stated differently, reasonable officials in the defendants' shoes would not understand that they were violating the plaintiff's constitutional rights by encouraging him to perform exercises he was taught by a doctor, arranging for him to receive follow-up care, and attempting to transfer him to a different prison facility at his request.

Dr. Figura helped the plaintiff get initial post-operative consultations with physical therapists and orthopedists at UConn Health; reviewed those specialists' recommendations; analyzed the results of the plaintiff's nerve conduction test; conducted multiple physical examinations of the plaintiff; prescribed pain medication for the plaintiff and ordered ice for his discomfort; wrote the plaintiff passes for access to knee braces, bottom bunk and bottom tier housing, a walker, and a wheelchair; explored the possibility of transferring the plaintiff to the Cheshire facility; referred the plaintiff for specialty orthotics; sought approval from the URC for

the plaintiff to have another physical therapy consultation at UConn Health; and relied on the treatment recommendations of the plaintiff's other medical treatment providers. (Doc. No. 123-23 at 14-22). APRN L'Heureux ordered painkillers and other medications for the plaintiff; conducted physical examinations of the plaintiff; sent the plaintiff to orthotic and physical therapy consultations; and deferred to the recommendations of the plaintiff's other medical treatment providers. (*Id.* at 24-36). Finally, although Phillips had little involvement in the plaintiff's treatment, she tried on three occasions to facilitate the plaintiff's transfer to other DOC facilities and referred the plaintiff for treatment by physical therapists at UConn. (*Id.* at 38-44). Moreover, the URC, which consists of doctors and healthcare providers, refused more than once to permit the plaintiff to receive treatment beyond that which he was prescribed by his doctors at UConn Health. (*Id.* at 10-11, 21). The facts in the record make clear that the defendants' conduct falls far short of deliberate indifference; to be sure, it is not beyond debate that every provider in the defendants' shoes would know that her conduct violated the Eighth Amendment.

The Court finds that the defendants did not violate a clearly established right and that their conduct was objectively reasonable. Therefore, the defendants are entitled to qualified immunity and are protected from liability.

## V.   CONCLUSION

For the reasons stated above, the defendant's Motion for Summary Judgment (Doc. No. 123) is **GRANTED**. Judgment is entered in the defendants' favor. As there are no remaining claims, the Clerk is directed to close this case.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge on October 3, 2022, (Doc. No. 115), with any appeal to be made directly to the Court of Appeals. *See* Fed. R. Civ. P. 73(b)-(c).

SO ORDERED at New Haven, Connecticut, this 6th day of January 2023.

          /s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge